838 P.2d 476

**BARNETT & CASBARIAN, INC., and National Union Fire Insurance Company of Pittsburgh, Claimants–Appellees,**

v.

**Leroy ORTIZ, Respondent–Appellant.**

**No. 12910.**

Court of Appeals of New Mexico.

June 29, 1992.

Certiorari Quashed Aug. 20, 1992.

Gail Stewart, Gallagher, Casados & Mann, P.C., Albuquerque, for claimants-appellees.

Gerald A. Hanrahan, Chavez Law Offices, Albuquerque, for respondent-appellant.

## OPINION

HARTZ, Judge.

Leroy Ortiz appeals from a decision of the Workers' Compensation Administration (WCA) that (1) reduced his previous award of permanent total disability to 55% permanent partial disability and (2) granted Claimants, Barnett & Casbarian, Inc., (Employer) and National Union Fire Insurance Company of Pittsburgh, a credit for overpayment of $23,249. We reverse and remand for reconsideration.

## I. BACKGROUND

On July 29, 1987, Ortiz filed a claim under the Workers' Compensation Act for permanent total disability and other benefits as a result of an accident on July 29, 1985. On September 22, 1987, a WCA Pre–Hearing Officer submitted a Recommended Resolution which included a finding of permanent total disability for Ortiz. Ortiz accepted the Recommended Resolution; Claimants did not object to it. The Recom-

mended Resolution therefore bound the parties. *See* NMSA 1978, § 52–5–5(C); *Norman v. Lockheed Eng'g & Science Co.,* 112 N.M. 618, 817 P.2d 1260 (Ct.App.1991).

On February 15, 1990, Claimants petitioned to reduce Ortiz's benefits and to receive credit for allegedly excessive benefits already paid. The Pre–Trial Order stated the issues as:

1. Whether [Ortiz's] total disability benefits should be reduced because of his employment in an elected capacity as Business Agent/Financial Secretary–Treasurer for Local Union No. 412, and if so, to what percentage and when.

2. Whether Claimants' [sic] are entitled to any reimbursement for alleged overpayment of benefits.

After an evidentiary hearing the Workers' Compensation Judge (WCJ) filed a decision that included comprehensive findings of fact and conclusions of law. Among the undisputed findings are the following: Ortiz was injured on July 29, 1985, in the course of his employment with Employer. Before the accident Ortiz was a pipe fitter supervisor, a job whose duties included paperwork and inspection of pipe fittings. His earlier employment had included work as a plumber, pipe fitter, pipe fitter foreman, and welder. In June 1987 Ortiz was elected as business agent/financial secretary-treasurer for Union Local 412 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, and Ortiz had continued in that position up to the time of the hearing on November 29, 1990. The WCJ found that Ortiz was employable as a financial secretary-treasurer and business agent.

The parties stipulated in the Pre–Trial Order that Ortiz was disabled from work as a pipe fitter, plumber, laborer, or pipe fitter supervisor. The record also reflects that Ortiz had twice been a job steward for Local 412 and served as president of the Local, a volunteer job, from May 1986 to June 1987. He won election to his paid union office in 1987 by twelve votes, and he

was reelected in 1990 by more than fifty votes.

The WCJ ruled that Ortiz was rendered 55% permanently partially disabled from August 1, 1987, and ordered that $23,249 in prior overpayments be credited toward future benefit payments owed Ortiz by Claimants. The WCJ elaborated on his decision in a Memorandum Opinion which reasoned that an elected union-official position constitutes work within the meaning of the Workers' Compensation Act and that a change in employment status constituted a change in condition under NMSA 1978, Section 52–5–9, even without a change in medical condition. The opinion also explained the basis for granting the credit to Claimants.

## II. DISCUSSION

As the parties agree, we are governed by the definitions of partial and total disability enacted in 1965. The statutory provisions read as follows:

> As used in the Workmen's Compensation Act [52–1–1 to 52–1–69 NMSA 1978], "total disability" means a condition whereby a workman, by reason of an injury arising out of, and in the course of, his employment, is wholly unable to perform the usual tasks in the work he was performing at the time of his injury, and is wholly unable to perform any work for which he is fitted by age, education, training, general physical and mental capacity and previous work experience.

NMSA 1978, § 52–1–24.

> As used in the Workmen's Compensation Act [52–1–1 to 52–1–69 NMSA 1978], "partial disability" means a condition whereby a workman, by reason of injury arising out of and in the course of his employment, is unable to some percentage-extent to perform the usual tasks in the work he was performing at the time of his injury and is unable to some percentage-extent to perform any work for which he is fitted by age, education,

training, general physical and mental capacity and previous work experience.

NMSA 1978, § 52–1–25.

### A. Work For Which Ortiz is Fitted

Ortiz's primary contention is that his union office is not "work for which he is fitted by age, education, training, general physical and mental capacity and previous work experience." § 52–1–24. If this contention is correct, then Ortiz must be totally disabled, because there is no evidence in the record that he is fitted for any other work. We hold, however, that the WCJ could properly determine that the union office is work for which Ortiz is fitted.

■ First, we agree with the WCJ that the duties of an elective position can be "work" within the meaning of Sections 52–1–24 and –25. The word "work" is not defined in the Workmen's Compensation Act. We note, however, that salaried elected public officers are covered by the Act. NMSA 1978, § 52–1–3.1 (Repl. Pamp.1987). Because the disability of an elected public officer is determined in part by whether the official is able "to perform the usual tasks in the *work* he was performing at the time of his injury," Section 52–1–24 (emphasis added), we infer that the duties of elected public officers constitute "work" and conclude that the duties of a person elected to a job also may come within the statutory usage of the word "work."

■ Ortiz further contends that even if the elective position he holds is "work," it is not work "for which he is fitted by age, education, training, general physical and mental capacity and previous work experience." § 52–1–24. To be sure, the fact of his election to his position does not establish his fitness. On the other hand, the possibility that an unsuitable person might be elected to the position does not establish that Ortiz is not fitted for the work he is doing. To determine Ortiz's fitness for his work, we examine the duties of the position in light of his background.

As union business agent, Ortiz's duties are: performing paperwork at a desk, conducting on-site inspections of contractors' job sites, settling jurisdictional disputes,

participating in contract negotiations, attending monthly membership meetings and making reports, serving on the Real Estate Corporation and as a trustee on the Pension/Health & Welfare Fund, conducting public relations work, and appointing and instructing job stewards. Job duties of the union financial secretary-treasurer are: performing financial transactions, ordering and paying for office supplies, taking care of members' travel cards and death benefits, collecting dues, making bank deposits, signing checks, and checking payroll reports.

Perhaps the ideal candidate for this position would be a young, physically vigorous individual with many years of experience in plumbing and degrees in accounting, law, and journalism. The likelihood of finding the ideal candidate is slim. One need not be ideal for the job to be "fitted" for it. The WCJ could properly find that Ortiz was fitted for the job if he possessed strong qualifications in some areas and was passable in other areas in which he could improve with experience and training. Ortiz's experience as a plumber and union member certainly enabled him to understand the needs and desires of union members. He had served twice as a job steward, giving him valuable experience for selecting and instructing others for such a position. He had worked as a general superintendent on jobs, dealing with labor disputes arising out of contracts and mediating disputes between members and between clients. In his position at the time of his injury, Ortiz was a supervisor who spent 10 to 15% of his time doing paperwork, a task that now takes about 20% of his time. His skills from his prior work experience also qualify him to perform on-site inspections. As president of the union local from May 1986 to June 1987 Ortiz conducted monthly membership meetings and undoubtedly honed public relations skills. Ortiz was physically capable of performing all the duties of his elective position except some climbing that would be helpful for on-site inspections. On this record the WCJ could properly find that Ortiz was fitted by age, education, training, general physical and mental capacity and previous work experience for the elective position of union business agent/financial secretary-treasurer.

As his final argument on this point, Ortiz contends that his benefits for total disability must be reinstated because the WCJ did not make specific findings regarding his fitness but found only that Ortiz was "employable" as a financial secretary-treasurer and business agent. We disagree. Findings need not cover every material fact, only ultimate facts. *McCleskey v. N.C. Ribble Co.*, 80 N.M. 345, 455 P.2d 849 (Ct.App.1969). *See* SCRA 1986, 1–052(B)(1)(b) (district court rule that findings shall consist only of ultimate facts). The WCJ made a finding regarding the extent of Ortiz's permanent partial disability. "[A] finding that a workman, to a stated percentage extent, is partially and permanently disabled is a finding of an ultimate fact." *Id.* at 346, 455 P.2d at 850.

In short, we reject Ortiz's contention that the WCJ could not properly find that he is fitted for his union elective position under the criteria set forth in Section 52–1–24. This holding, however, does not end our inquiry. Ortiz also argues that the special, the unusual, nature of his present employment requires that it not be considered in determining his disability. We now turn to that question.

B. The Odd–Lot Doctrine and Partial Disability

In addition to his claim that he is not "fitted" for his elective position, Ortiz contends that the odd-lot doctrine, *see generally* 2 Arthur Larson, *The Law of Workmen's Compensation* § 57.51 (1989) [hereinafter Larson], requires that he be found permanently *totally* disabled. He quotes the following proposition from *Lozano v. Archer*, 71 N.M. 175, 181, 376 P.2d 963, 967 (1962):

"An employe[e] who is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist, may well be classified as totally

disabled." (Quoting *Lee v. Minneapolis St. Ry.* [230 Minn. 315] 41 N.W.2d 433, 436 (Minn.1950)).

Ortiz contends that the doctrine applies because there is no evidence of his fitness for any position other than the elective office. This contention requires us to examine the concepts of disability and partial disability under the Workmen's Compensation Act.

### 1. Capacity to Perform Work

■ Under the definitions of total and partial disability in Sections 52–1–24 and – 25, "the primary test of disability [is] capacity to perform work." *Quintana v. Trotz Constr. Co.*, 79 N.M. 109, 111, 440 P.2d 301, 303 (1968), *overruled on other grounds by American Tank & Steel Corp. v. Thompson*, 90 N.M. 513, 565 P.2d 1030 (1977).[1] The word "capacity" connotes qualities inherent in the individual. "Capacity to perform work" is the product of the individual's physical and mental power and dexterity, as augmented by education, training, and experience. One's capacity to perform work should ordinarily be considered to remain constant so long as one's prowess does not change.

■ At the same time, however, whether an individual's skills constitute a capacity to perform work depends upon what work is being performed by members of society. A physically disabled mathematician may have no capacity to perform work in a primitive society but be a prized employee in the post-industrial age. Thus, in measuring one's capacity to perform work it is necessary to look to the job market.

How do we define the pertinent job market? Is it the specific jobs available to the injured worker at a particular time or is it the general market in which workers are being employed—the collection of all jobs, whether filled or unfilled? The Workmen's Compensation Act is not a wage-replacement statute which simply compares the worker's earnings before and after injury. Under a wage-replacement statute, benefits could be determined on the basis of the specific situation of the worker, with benefits being adjusted as the worker finds or loses a job. When the measure of benefits is the worker's *capacity*, however, benefits should not ordinarily change just because of a fluctuation in job openings. It would be peculiar to speak of a change in one's *capacity* as specific jobs open up or become filled. In other words, the job market by which disability is to be measured should be the general market in which workers are being employed.

Although no case is directly in point, *Strickland v. Coca–Cola Bottling Co.*, 107 N.M. 500, 760 P.2d 793 (Ct.App.1988), supports this view. That opinion considered a claim of disability under the 1986 amendments to the Workmen's Compensation Act, commonly referred to as the Interim Act. Under that Act total disability required a "permanent physical impairment ... resulting by reason of an accidental injury arising out of and in the course of employment whereby a workman is wholly unable to earn comparable wages or salary." NMSA 1978, § 52–1–24 (Cum.Supp. 1986). Worker admitted that his medical restrictions did not prevent him from performing clerical work but stated that there were no job openings available. We rejected his contention that "the inability to earn comparable wages need not result from his physical impairment, but may be due to the unavailability of work." *Strickland*, 107 N.M. at 502, 760 P.2d at 795. In other words, a worker's ability (or capacity) is a quality independent of the vagaries of job openings.

Applying our analysis thus far to the facts of this case, we conclude that the election of Ortiz to his union position is irrelevant to the determination of his disability. Because his disability is measured by his *capacity* to perform work, it does

---

1. In particular, we note that the test for disability is not wage-earning ability. *Quintana*, 79 N.M. at 111, 440 P.2d at 303. Thus, we reject Ortiz's contention that he must be considered totally disabled because he is now able to earn only a fraction of what he could earn before his injury. To the extent that *Aranda v. Mississippi Chem. Corp.*, 93 N.M. 412, 416, 600 P.2d 1202, 1206 (Ct.App.1979), relied upon by Ortiz, suggests that disability is measured by a decrease in ability to earn a pre-injury level of income, *Aranda* misstates the law.

not matter whether he actually succeeds in obtaining a particular job. The material fact is the existence of a job for which Ortiz is fitted. Whether or not he obtains the votes necessary for election to the position does not affect his capacity to perform work.[2]

### 2. Meaning of Partial Disability

The next question that presents itself is how does the existence of the union elective position affect the measure of Ortiz's disability. The answer to this question requires consideration of the meaning of *partial* disability.

█ If a worker is, like Ortiz, wholly unable to perform the usual tasks in the work he was performing at the time of his injury, his partial disability is determined by his inability "to some percentage-extent to perform any work for which he is fitted." § 52–1–25. In *Anaya v. New Mexico Steel Erectors*, 94 N.M. 370, 610 P.2d 1199 (1980), our supreme court clarified that "work for which he is fitted" includes work that the worker could do before his injury but is now unable to do because of the injury. How is the percentage computed?

The natural reading of the statutory definition of partial disability is that partial disability is measured by the extent to which the worker is unable to perform work for which he or she was fitted before the injury. If the jobs for which a worker is fitted are reduced in number, then the worker's percentage of disability is increased. After all, the worker is then able to perform only a percentage of the work that the worker could perform before. Although New Mexico case law has not addressed in any depth the meaning of "partial disability," no opinion is contrary to our

view and the results in several cases support the view that a worker is partially disabled if the worker is unable to perform jobs that he or she could perform before the work injury. In *Anaya* the supreme court affirmed an award of 50% disability to a heavy construction worker whose injury restricted his subsequent employment to light construction and maintenance.[3] In *Jaramillo v. Kaufman Plumbing & Heating Co.*, 103 N.M. 400, 708 P.2d 312 (1985), the supreme court adopted the opinion of Judge Donnelly from this court, upholding an award of 15% permanent partial disability to a worker whose injury prevented him from continuing employment as a carpenter but who was qualified to serve as a law enforcement officer, a position for which he had experience prior to his accident. In *Schober v. Mountain Bell Telephone*, 96 N.M. 376, 630 P.2d 1231 (Ct.App.1980), we upheld an award of 30% permanent partial disability to a worker who could no longer obtain employment in electronics but could work in installing sprinkler systems. *Gonzales v. Stanke–Brown & Assocs.*, 98 N.M. 379, 381, 648 P.2d 1192, 1194 (Ct.App.1982), affirmed a finding that a cement finisher's partial disability increased as a result of an accident that decreased his ability to perform certain tasks such as using a sledge hammer and handling forms.

These representative cases illustrate that the percentage of partial disability is based on the reduction in the spectrum of work for which the injured worker is fitted. The reduction may be the result of the elimination of certain jobs that the worker can no longer perform (carpenter, heavy laborer, etc.) or a reduction in the worker's ability to perform certain tasks associated with the worker's current job (handling forms, etc.), which presumably reduces the work-

---

**2.** Nothing in this opinion calls into question our prior recognition that in order to encourage employers to assist their injured workers, a special job created by an employer for an injured worker may be considered in reducing the employer's liability for payment of disability benefits to the worker. *See Dodrill v. Albuquerque Utils. Corp.*, 103 N.M. 737, 713 P.2d 7 (Ct.App. 1985); *Salcido v. Transamerica Ins. Group*, 102 N.M. 217, 219, 693 P.2d 583, 585 (1985); *Aranda*

*v. Mississippi Chem. Corp.*, 93 N.M. 412, 600 P.2d 1202 (Ct.App.1979).

**3.** Although, as noted by Judge Bivins' dissent, *Anaya* refers in one sentence to wage-earning ability, the court's analysis appears to address the capacity-to-perform-work test for measuring disability.

er's job opportunities.[4]

We find additional support for our conclusion in jurisdictions that measure disability in terms of wage-earning capacity. Several courts in those jurisdictions have held that a worker earning as much as before the work injury is partially disabled if the spectrum of employment opportunity has been reduced by the accident. *See Todd Shipyards Corp. v. Allan*, 666 F.2d 399 (9th Cir.), *cert. denied*, 459 U.S. 1034, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982); *Shroyer v. Industrial Comm'n*, 98 Ariz. 388, 405 P.2d 875 (1965) (in division); *Taylor v. Columbia Falls Aluminum Co.*, 243 Mont. 464, 795 P.2d 433 (1990); *Ford v. State Accident Ins. Fund*, 7 Or.App. 549, 492 P.2d 491 (1972).

### *3. What is an odd-lot job?*

■ Do any special considerations come into play when the worker suffers an almost complete reduction in the spectrum of work for which he or she is fitted? Ortiz argues that when the only job for which he is fitted is a job such as the union elective position, the odd-lot doctrine applies and he is entitled to benefits for total permanent disability.

Although we find this contention close to being right, we do not apply the odd-lot doctrine in this circumstance. As it has been applied in other jurisdictions, the odd-lot doctrine excludes casual or odd-job employment from consideration in determining a worker's disability. For example, Larson, *supra*, summarized *Minneapolis Street Railway*, the opinion quoted by our Supreme Court in *Lozano v. Archer*, 71 N.M. 175, 376 P.2d 963 (1962), as follows:

> Claimant, a streetcar flagman, as a result of being caught between two streetcars, suffered the loss of his left eye, 75 percent loss of use of his left arm, 10 percent loss of use of the right ankle and foot, and severe post-traumatic neurosis. He worked for short periods thereafter as a conductor, as an income tax worker, as a house-to-house canvasser, and as a

detective, all with great difficulty and discomfort. The supervisor of placements of the Minnesota state employment service was permitted to testify that gainful jobs with reasonable continuity were not available for a person so handicapped. The Supreme Court, applying the rule quoted above, held that such evidence was admissible, and that the sporadic employment and earnings shown were not inconsistent with this concept of total disability.

§ 57.51(a) at 10–164.67. Judge Cardozo wrote of the "odd lot" man whose only work "is likely to be casual and intermittent." *Jordan v. Decorative Co.*, 230 N.Y. 522, 130 N.E. 634, 636 (1921). We can appreciate the qualitative difference between a regular job and intermittent employment and how that difference could justify not considering intermittent employment when measuring a person's capacity to perform work. Nevertheless, the job for which Ortiz is fitted—that of union business agent/financial secretary-treasurer—is not a casual or intermittent job. It is a full-time, continuing employment.

We recognize that Ortiz's job is apparently unique and that the statement of the odd-lot doctrine in *Minneapolis Street Railway*, which was quoted in *Lozano*, may be read as including within the doctrine not only casual and odd-job employment but also regular employment in a special job in which only a very few people are employed. But we reject the application of the odd-lot doctrine in this circumstance. We see no principled way to determine where to draw a line saying that a particular job is sufficiently rare that it should not be considered in evaluating the extent of disability. If a unique job should not be considered, what about a job in which only two persons are employed? What if a job is unique, but only two or three persons are qualified to perform it? Rather than excluding consideration of a full-time, continuing job because of its rarity, the rarity should simply be factored into the determination of the extent of partial

---

4. Of course, rehabilitation can restore the worker to a position of being able to perform as wide a spectrum of work as before the accident, thereby ending any disability. *See Medina v. Wicked Wick Candle Co.*, 91 N.M. 522, 577 P.2d 420 (Ct.App.1977).

disability. If the worker can perform only a unique job, the worker's partial disability may be very close to 100%—so the disability benefits obtained would be almost the same as they would be if the odd-lot doctrine were applied to such a circumstance (which is why we said above that Ortiz's contention is close to being right)—but in principle the disability is not 100%.

*Lozano,* which affirmed an award of total disability benefits to a worker employed in his family's grocery store, is not contrary to our understanding of the odd-lot doctrine. New Mexico law at that time defined disability in terms of wage earning ability. *Lozano* found that worker could not earn wages in a competitive market. His only work was assisting his wife in a family grocery store, and any income derived therefrom could be attributed to capital investment rather than his labors.

### 4. *Ortiz's Percentage–Extent of Disability*

 Imbedded in Ortiz's briefs is the contention that the WCJ awarded too low a percentage of permanent partial disability. In an argument that merges into his odd-lot doctrine argument, Ortiz contends that his job opportunities have been reduced to such a large extent by his injury that the WCJ should not have reduced his total disability benefits. We take this contention to be that his partial disability was so close to 100% that the WCJ should have continued disability benefits at the 100% level. The WCJ found a partial disability of only 55%.

Thus, implicit in this argument of Ortiz is that the record cannot support such a reduced partial disability award.[5]

As illustrated by the New Mexico opinions cited above on the issue of partial disability, e.g., *Schober v. Mountain Bell Telephone,* 96 N.M. at 382, 630 P.2d at 1237, ordinarily we do not review on appeal the percentage of the partial disability award. That determination is essentially a fact-finding by the lower tribunal. *Id.* In this case, however, we believe that a remand for reconsideration is appropriate because the WCJ appears to have applied an incorrect legal standard in making his findings.

One indication that the WCJ applied the incorrect legal standard is the result reached by the WCJ. The spectrum of job opportunities for Ortiz was reduced so dramatically by his injury that an award of just 55% permanent partial disability would be very difficult to justify under the legal standard set forth in this opinion. A second indication is the WCJ's determination that Ortiz's election constituted a sufficient change in condition to warrant a modification of the benefits awarded by the recommended resolution. This statement by the WCJ is incorrect because, as noted above, a worker's capacity to perform work is the same whether or not the worker obtains a job for which he or she is fitted. A worker's employment after an award of disability may be new evidence revealing the worker's capacity to perform work and the new evidence may justify reopening the

---

5. In his dissent Judge Bivins contends that Ortiz did not preserve this issue before the WCJ and did not raise it properly on appeal. Although this is a close question, we disagree. Ortiz has consistently argued that, in accordance with the odd-lot doctrine, he is entitled to benefits for total disability because his opportunities for employment have been drastically limited. To address this contention properly, it was necessary for us to study the odd-lot doctrine and to consider the scope of that doctrine in light of the statutory provisions governing partial disability. Our analysis led to the conclusion that a major reduction in the spectrum of job opportunities should not result in application of the odd-lot doctrine and an award of total disability, but should be factored into an award of partial disability, even though the partial disability award may end up being very close to 100%.

Having performed that analysis, we could then simply affirm the WCJ on the ground that we have rejected Ortiz's invocation of the odd-lot doctrine. Doing so, however, would serve only to deny Ortiz the benefit of a legal analysis of partial disability that his appellate issues required us to undertake. Although not without reservation, we believe that in the circumstances of this case Ortiz's argument that (1) his job opportunities are so limited that his disability should be 100%, can be said to incorporate the argument that (2) his job opportunities are so limited that his disability should be much greater than 55%. Ortiz's argument under the odd-lot doctrine sufficiently alerted the WCJ and this court to the inadequacy of the partial disability award that he is entitled to benefit on remand from our analysis of the concept of partial disability.

award, but the employment itself is not a change in condition. Because it appears that the WCJ applied an incorrect legal standard in awarding Ortiz's percentage-extent of disability, reconsideration of the award is necessary. *See Whittenberg v. Graves Oil & Butane Co.*, 113 N.M. 450, 827 P.2d 838 (Ct.App.1991).

## III. CONCLUSION

We remand to the WCJ for reconsideration of Ortiz's percentage of permanent partial disability. The WCJ should determine Ortiz's partial disability after considering (1) the reduction in the spectrum of job opportunities for which Ortiz is fitted as a result of his injury, (2) Ortiz's inability to perform tasks in his present job, and (3) any increase in Ortiz's job opportunities as a result of post-injury training and experience. The WCJ should also reconsider, in light of this opinion, whether an award of retroactive credit to respondents is equitable under the circumstances.

IT IS SO ORDERED.

BLACK, J., concurs.

BIVINS, J., dissents.

BIVINS, Judge (dissenting).

While I agree with the majority that the Workers' Compensation Judge (WCJ) could properly find that the union office is work for which Worker is fitted, and that the odd-lot doctrine is inapplicable to the facts of the present case, I cannot agree with the majority opinion which adopts "reduction in the spectrum of job opportunities" as an additional test for disability, and remands for reconsideration based on that standard. I therefore respectfully dissent.

My concerns include: (1) lack of preservation of that issue; (2) failure to raise the issue on appeal, or, to the extent the reply brief may be said to suggest the issue, raising the issue too late; (3) "reaching out" to find basis for reversal; (4) adopting a test for disability that is not supported by case law on which opinion relies, and one that is contrary to the plain wording of the statutes, and (5) lack of direction to the

WCJ as to what is expected on remand. I will expand on some of these concerns.

### 1. Lack of Preservation

The pre-trial order sets forth the only issues remaining to be decided. The first issue is "whether Respondent's total disability benefits should be reduced because of his employment in an elected capacity ... for Local Union No. 412, and if so, to what percentage and when." As I read Worker's requested findings, particularly numbers 16–27, he is asking the WCJ to find that he is wholly unable to perform: (1) the task of the job he was doing at the time of the injury; and (2) any other work for which he is fitted by reason of the criteria set forth in the statute. I do not read the requested findings as asking the WCJ to consider, in determining disability, the reduction in the spectrum of job opportunities. In sum, in order for this court to consider the issue, Worker must have invoked a ruling below. *See* SCRA 1986, 12–216(A); SCRA 1986, 12–213(A)(3); *see also Gutierrez v. Albertsons, Inc.*, 113 N.M. 256, 259–60, 824 P.2d 1058, 1061–62 (Ct. App.1991) (burden on appellant to show issue ruled on below), *cert. denied*, 113 N.M. 44, 822 P.2d 1127 (1992).

### 2. Failure to Properly Raise the Issue on Appeal

Moreover, I do not see anything in Worker's brief-in-chief raising the reduction in the spectrum of job opportunities as an issue. Worker argues that his election to a union office was not "any work" for which he is fitted. His argument is based on the odd-lot doctrine which the majority rejects. I recognize in his reply brief, Worker does mention reduction in job opportunities; however, even if it can be said he intended to raise the issue that the majority now uses as its rationale, I think the issue came too late. *See* SCRA 1986, 12–213(A); *see also Doe v. City of Albuquerque*, 96 N.M. 433, 436, 631 P.2d 728, 731 (Ct.App.1981); *Santistevan v. Centinel Bank*, 96 N.M. 734, 737, 634 P.2d 1286, 1289 (Ct.App.1980); *rev'd in part on other grounds*, 96 N.M. 730, 634 P.2d 1282 (1981). Moreover, I interpret that brief remark regarding re-

duction in job opportunities as being in the context of the preceding sentences dealing with Worker being limited to only three possible union offices, not a reduction of job opportunities in the general market.

### 3. Reaching Out for a Basis for Reversal

I believe that the majority strains to find a reason to remand, and unnecessarily suggests the result desired to be reached. *See State ex rel. Human Servs. Dep't v. Staples (In re Doe)*, 98 N.M. 540, 541, 650 P.2d 824, 825 (1982) (error for Court of Appeals to ignore arguments presented in briefs and issue opinion on ground not raised). It is not clear to me whether remand is based on the failure to consider the reduction in spectrum of job opportunities, or the fact that the WCJ may have weighed in his calculation the fact that Worker actually won his election. I think the analysis by the WCJ dispels that contention. Reference to the election was included, as I read the analysis, to answer Worker's argument that "the elected union official position does not constitute work," the position that Worker has taken on appeal under his first issue. The WCJ, referring to 1A Arthur Larson, *The Law of Workmen's Compensation* § 56–35 (1989), considered elected positions for union officials just as compensable for workers' compensation purposes as elected positions for public officials such as judges. I see no undue amount of weight given to that factor which would in any way justify remand.

### 4. "Reduction in Spectrum" Test

As I understand the majority opinion, an additional test is being adopted to determine disability: "reduction in the spectrum of job opportunities." While the majority opinion suggests that the test is supported by both statutes and case law, I would disagree. The test is not supported by case law on which the opinion relies, and is contrary to the plain wording of the statutes.

1. Indeed, Worker could hardly claim 55% partial disability inadequate when he is able to perform all the tasks of the two union positions

### a. New Mexico Statutes

Partial disability is defined as:

[A] condition whereby a workman, by reason of injury arising out of and in the course of his employment, is unable to some percentage-extent to perform the usual tasks in the work he was performing at the time of the injury and is unable to some percentage-extent to perform any work for which he is fitted by age, education, training, general physical and mental capacity and previous work experience.

NMSA 1978, § 52–1–25. The statute does not support consideration of the "reduction in spectrum" of job opportunities, but rather concentrates on the ability to perform work a worker had been performing and "any work for which he is fitted by age, education, training, general physical and mental capacity and previous work experience." *Id.* Having upheld the WCJ's findings that the union position was a real job and that Worker is unable, by reason of the criteria set forth above under Section 52–1–25, to perform the usual tasks in the work, this court should affirm. Curiously, Worker does not challenge that percentage, only whether the work constituted a real job as opposed to odd-lot work.[1]

### b. New Mexico Cases

The majority also suggests that the New Mexico cases cited in the opinion are "representative" and "illustrate that the percentage of partial disability is based on the reduction in the spectrum of work for which the injured worker is fitted." I do not find support for the "reduction in spectrum" test in these cases.

One of the cases relied on by the majority is *Anaya v. New Mexico Steel Erectors*, 94 N.M. 370, 610 P.2d 1199 (1980). I note initially that the validity of this case has been questioned in later decisions of this court because *Anaya* apparently inadvertently relied on our earlier wage-earning statute, rather than the relevant capacity to do work statute. *See Smith v. Trailways Bus Sys.*, 96 N.M. 79, 81–82, 628 P.2d 324, 326–27 (Ct.App.1981).

except for climbing, a task that is apparently non-essential to his responsibilities.

Even if *Anaya* were relevant, it does not support the majority's conclusion. In *Anaya*, the supreme court explained that while the worker was fitted to perform his present job involving light construction because of his experience and skills, his present disability (injury to right elbow resulting in partial loss of use of right arm and hand and permanent pain in area) "prevents him from performing *all* of the work for which he is fitted by his experience and skills: heavy construction and iron work." *Id.* at 372, 610 P.2d at 1201. Later the opinion explains that "a workman is disabled if he cannot perform *some or all the work* for which he is fitted by reason of the various factors listed in the statute." *Id.* In the instant action, because Worker is unable, due to his injury, to perform some of the work for which he is fitted—pipe fitting and presently climbing in and out of ditches—an award of partial disability would be proper. *Anaya* does not appear to hold that "partial disability is based on the reduction in the spectrum of work for which the injured worker is fitted" but rather track the language of the statute in holding that partial disability is based on the reduction in ability to perform that work for which the employee is fitted under the statute.

In *Jaramillo v. Kaufman Plumbing & Heating Co.*, 103 N.M. 400, 708 P.2d 312 (1985), the worker, a carpenter, fell and hit his head when jumping from a scaffold. As a result of his injuries, the worker complained of neck pain, headaches, dizziness, and pain and numbness in his right shoulder and arm. The worker was employed as a police officer for a period of time after his injury. In *Jaramillo*, the worker conceded that he was no longer totally disabled. *Id.* at 404, 708 P.2d at 316. While the court did not expressly state its reasons for affirming a finding of 15% partial disability, the court discussed cases such as *Anaya*, which held that inability to perform some of the work for which an individual was fitted was sufficient to uphold a finding of partial disability. Again, I see no suggestion in this case that the reduction of the spectrum of work for which the employee was fitted was a factor.

In *Schober v. Mountain Bell Telephone*, 96 N.M. 376, 630 P.2d 1231 (Ct.App.1980), the worker could no longer perform some of the work for which he was fitted (electronics) because of his injury (smoke allergy). The worker learned how to install sprinklers and started his own business. The worker was found 30% disabled. Reasoning that because the worker's current employment did not utilize his training and background experience, the court affirmed an award for disability benefits. *Id.* at 381, 630 P.2d at 1236. While the meaning of this statement is less than clear, I do not read it to mean the court considered reduction in job opportunities.

Finally, in *Gonzales v. Stanke–Brown & Associates, Inc.*, 98 N.M. 379, 648 P.2d 1192 (Ct.App.1982), the worker testified as to a decreased ability to perform certain tasks of his job and an increase in the time taken for those tasks which he was able to continue performing. The court decided the issue of disability summarily, finding that the worker's testimony supported a finding of increased disability. *Id.* at 381, 648 P.2d at 1194. None of the New Mexico cases cited in the majority opinion support application of the "reduction in spectrum" test as suggested by the majority opinion.

#### c. Other Authority

The majority "find[s] additional support for [its] conclusion in jurisdictions that measure disability in terms of wage-earning capacity." These cases are distinguishable because the statutes involved use earning capacity as the basis for disability, not capacity to perform work. *Quintana v. Trotz Construction Co.*, 79 N.M. 109, 111, 440 P.2d 301, 303 (1968), *overruled on other grounds by American Tank & Steel Corp. v. Thompson*, 90 N.M. 513, 565 P.2d 1030 (1977), sets forth the test in New Mexico applicable to this case. It is easy to see why reduction in the spectrum of job opportunities could affect loss in wage-earning capacity. As noted in *Taylor v. Columbia Falls Aluminum Co.*, 243 Mont. 464, 795 P.2d 433 (1990), for example, one of the cases cited by the majority, the worker, although returning to employment in a less strenuous job, had less advancement opportunities. *Id.* at 435. Applying

the test for loss of earning capacity or whether the industrial accident caused a loss of ability to earn in the open market, the court affirmed the lower court's award. Those considerations are not relevant to capacity to perform work, the test in New Mexico. The majority's out of state cases do not support the conclusion reached. The majority has, by grafting on the reduction in spectrum of job opportunities standard to reduction of capacity to perform work, created a hybrid test. Not only is the new test beyond the plain meaning of the statute, I find it difficult to understand any justification for the change now. The capacity to perform work standard has been the law for almost thirty years.

Moreover, if the majority's position regarding the "reduction in spectrum" of job opportunities is not new, then I do not understand the rationale for remand. I believe that the WCJ's findings of fact are sufficiently broad to have covered the statutory language, and if the concept of "reduction in spectrum" of job opportunities is implicit within that language, then his findings include that concept. Moreover, there was testimony brought out by Worker's attorney through Mr. Patrick Ortiz regarding other employment, i.e., administrative assistant to contractors; therefore, how can we say that the WCJ did not consider this in his findings? The majority's statement that there was no evidence in the record that Worker is fitted for any other work is incorrect.

### 5. Lack of Direction

My final concern is the lack of direction provided to the WCJ as to what is expected on remand, i.e., who has burden of proving reduction of spectrum of job opportunities and, since this is a new concept, whether additional evidence may be received. If I understand the "reduction of spectrum" concept, it means that there must be proof not only of inability, either in whole or in part, to perform "any work for which [worker] is fitted," but also there must be proof of the reduction of job opportunities in the general market. Who has the burden of proof of this second test? In *Brown v. Safeway Stores, Inc.*, 82 N.M. 424, 427, 483 P.2d 305, 308 (Ct.App.1970), this court states that once the worker puts on evidence as to his limitations and restric-

tions, then it is up to the employer to prove jobs for which the worker is fitted. Does this test require that the employer not only prove fitness but also the general spectrum of job opportunities and the extent to which the worker cannot find employment? Additionally, how does the "reduction in spectrum" of job opportunities factor into the equation? For example, where an injured worker is re-employed in a new job for which he is fitted, although with some disability, as in the case before us, how does the WCJ factor in the reduction of the spectrum of job opportunities? Here, the WCJ awarded 55% permanent partial disability apparently because Worker was unable to climb in and out of ditches, a desirable but apparently non-essential aspect of his job as business agent for the union. I would assume, based on the majority opinion, the WCJ must now factor in additionally any reduction in spectrum of job opportunities. What weight is to be given to this new standard? How is it to be considered—i.e. in addition to, or along with, reduction in capacity?

Because I cannot agree with the majority's decision to remand based on the "reduction of spectrum" test, I dissent.